BEAUMONT RICE MILLS et al. v. PORT ARTHUR RICE MILLING CO.

(Court of Civil Appeals of Texas. Galveston. Oct. 31, 1911. Rehearing Denied Nov. 23, 1911.)

1. CHATTEL MORTGAGES (§ 48*)—DESCRIPTION OF PROPERTY—SUFFICIENCY.

A chattel mortgage describing the property as all crops grown by the mortgagor in a given year on 2,500 acres constituting part of a 3,540-acre tract, and including all north of a certain line, with certain definite exceptions, etc., sufficiently described the property, aided by extrinsic evidence.

[Ed. Note.—For other cases, see Chattel Mortgages, Cent. Dig. §§ 93–95; Dec. Dig. § 48.*]

2. LIMITATION OF ACTIONS (§ 55*)—ACCRUAL OF CAUSE OF ACTION—TIME.

A cause of action in favor of a chattel mortgagee for conversion of the property accrued when the property was applied to claims other than the mortgages in repudiation of the mortgage, unless he was excusably ignorant of the cause of action.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 299–306; Dec. Dig. § 55.*]

3. LIMITATION OF ACTIONS (§ 197*)—IGNORANCE OF RIGHT OF ACTION —EVIDENCE— SUFFICIENCY.

Evidence *held* insufficient to show that a chattel mortgagee was ignorant of the accrual of a cause of action for conversion, as affecting bar by limitations.

[Ed. Note.—For other cases, see Limitation of Actions, Dec. Dig. § 197.*]

Appeal from District Court, Jefferson County; L. B. Hightower, Jr., Judge.

Action by Port Arthur Rice Milling Company against the Beaumont Rice Mills and others. Judgment for plaintiff, and defendants appeal. Reversed and rendered.

Taliaferro & Barry and A. D. Lipscomb, for appellants. Smith, Crawford & Sonfield, J. V. Fleming, and D. W. Glasscock, for appellee.

McMEANS, J. The Port Arthur Rice Milling Company, a corporation, brought this suit against the Beaumont Rice Mills, a partnership composed of J. E. Broussard, J. M. Hebert, 'L. M. Hampshire, M. S. Hampshire, E. J. Le Blanc, and B. C. Hebert, and against said individuals as partners, to recover the value of a rice crop alleged to have been grown by R. T. Burge on that part of the Stivers league, in Jefferson county, which lies south of the Gulf & Interstate Railway track. Plaintiff alleged that the crop was covered by two mortgage liens in its favor under two contracts of date February, 1905, and June, 1905, respectively, and that same was planted and cultivated with seed and supplies furnished by plaintiff to said Burge; that 150 acres farmed by Burge south of the railroad track was excepted from the mortgage as well as was all crops south of the railroad farmed by "other than Burge"; that the crop in question was about 500 acres; that the same was really farmed by Burge, though its ownership was concealed by a succession of transfers designed to conceal the fact that it was farmed by Burge and therefore included in plaintiff's mortgages; and that finally defendants, in confederacy with those who were parties to said fraudulent transfers, received the proceeds of the sale of the rice crop and by affirmative rep-

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

resentations of their managing partner concealed from plaintiff the fact of having received the same, so that the cause of action was not discovered by plaintiff until the year 1907, the suit having been filed November 27, 1907. The petition does not show when the alleged conversion occurred. Plaintiff's petition involved other crops besides that grown south of the railway track; but all these are eliminated on this appeal. The defendants, partners, answered both as partners and as individuals, urged many exceptions to the petition, pleaded the general denial and the two years' statute of limitations. The case was tried before a jury and resulted in a verdict and judgment for plaintiff for $11,360.98 against the Beaumont Rice Mills "as a partnership and against no individual thereof." The judgment of the court was for said sum against the partnership and each individual member thereof. From this judgment the defendants, after their motion for new trial had been overruled, have prosecuted this appeal.

The description contained in the two contracts or mortgages in question from Burge to plaintiff are practically identical. That in the mortgage of February 11, 1905, is as follows: "In consideration of such advances * * * the said J. F. Burge has granted, sold and conveyed * * * unto the Port Arthur Rice Milling Company * * * the following described personal property, to wit: Being all of the rice crop and all other crops of every kind and nature to be raised during the year 1905, which is to be grown and made upon * * * 2,500 acres of land in Jefferson county, Texas, being part of, the same land that is leased to J. F. Burge, under contract dated January 1, 1904, which lease is to run for three years from that date, from W. C. Tyrrell, of Beaumont, Texas, land described in lease being 3,540 acres, for more particular description of which land reference is made to deed from John H. Broocks to W. C. Tyrrell, of record, in deed records of Jefferson county; also S. ½ of T. & N. O. school section 14 and all land in Stivers league that is at date of lease under lease to W. C. Tyrrell, all of said land being in Jefferson county, Texas. This is not to include any portion of the above-described land that is now farmed by other than the said Burge; neither does this mortgage cover about 150 acres that the said Burge is farming south of the G. & I. R. R. It being the intention to include in this mortgage all rice grown on land situated north and west of the G. & I. R. R. and leased from W. C. Tyrrell, except about 250 acres now farmed by A. Hamilton."

The description in the lease referred to is: "All the land owned by first party (W. C. Tyrrell) in what is known as the Stivers league in Jefferson county, Texas, being 3,540 acres, for a more particular description of which land reference is made to a deed from John H. Broocks to said first party, now of record in the deed records of Jefferson county, Texas; also the south one-half of what is known as the Texas & New Orleans Railroad Company's school section No. 14, in Jefferson county, Texas; also all the land in the above-mentioned Stivers league that is at this date under lease to said first party."

No deed from Broocks to Tyrrell for 3,540 acres was introduced; but the plaintiff did introduce the description in a deed from Broocks to Tyrrell of 1,878.8 acres of the Stivers league, which is as follows: "All that certain lot, tract or parcel of land lying and being situated in Jefferson county, Texas, about five or six miles in a southwesterly direction from the city of Beaumont, and described as follows: Being a portion of the Samuel Stivers league survey, and containing one thousand eight hundred and seventy-eight and eight-tenths acres, same beginning at a point on the south boundary line of said Samuel Stivers league survey where the east boundary line of the right of way of the G. & I. R. R. of Texas crosses said line. Thence east with the south boundary line of said league to the southeast corner thereof. Thence north with the east boundary line of said league to where said east boundary line strikes Double-Point bayou. Thence up said bayou with its meanders to the east boundary line of the right of way of the said G. & I. Ry. of Texas. Thence southwesterly following the said east boundary line of the said right of way of said railway to the place of beginning, containing as aforesaid one thousand eight hundred seventy-eight and eight-tenths acres."

The Stivers league is rectangular in form, practically equilateral, and its lines run with the cardinal points of the compass. The Gulf & Interstate Railway traverses same from its northeast to its southwest corner, intersecting its north boundary line a short distance west of its northeast corner, and intersecting its south boundary line a short distance east of its southwest corner, thus dividing the league into two tracks about equal size and form and being almost triangles. One of the triangles lies north and west of the railway, and the other lies south and east thereof. All of the latter triangular half of the league lying south and east of the railway track is described in the deed from Broocks to Tyrrell except a very small tract cut off the upper or north corner thereof by Double-Point bayou.

In the execution of the mortgages herein referred to, and in other transactions, R. T. Burge pretended to be acting as agent and attorney for his father, J. F. Burge; but it was shown by the testimony and admitted by the parties that in all such transactions R. T. Burge was acting for himself. We will treat him in this opinion as the real principal in all his transactions that we may have occasion to mention.

On February 16, 1905, Burge, in returning to plaintiff the mortgage dated February 11, 1905, wrote to George M. Craig, plaintiff's general manager, in effect that he had changed the mortgage prepared for his signature so as to make it read that it did not cover about 200 acres farmed by Hamilton, nor a field south of the railway which he intended planting with about 50 bags of imported seed; and on this letter is a notation of Mr. Craig instructing his clerk to accept the mortgage excluding 250 acres north and west of the railroad and the 150 acres south of the railroad, and reciting that Burge says he will farm 2,500 acres exclusive of what Hamilton is farming.

[1] By their first assignment of error appellants complain of the refusal of the trial court to instruct the jury to return a verdict in their favor. Their propositions under the assignment are as follows:

"A mortgage on all crops to be grown by the mortgagor in a given year on 2,500 acres of land, part of what appears on the face of the mortgage to be at least a 3,860-acre body, with a qualification that it is intended to include all north of a certain line, with certain definite exceptions, but is not to include certain crops south of said line, and which contains no other elements of description, is good as to that north of the line, but wholly void for patent ambiguity as to any land south of said line that may have been in the minds of the parties; and, if it was intended to apply to any south of said line, it could only be given that effect in a suit for reformation.

"An action for conversion of property alleged to be mortgaged to plaintiff, when prosecuted against persons not parties to the mortgage, fails where the plaintiff fails to show by consistent extrinsic evidence that the property was within the intent of the parties as expressed on the face of the instrument."

In overruling the assignment and propositions, we think it sufficient to say that in our opinion there is no patent ambiguity in the description of the land upon which the mortgaged crops were to be grown, but the description is such that such land and the mortgaged crops might be identified by extrinsic evidence. As before stated, the crops grown north of the railroad track are not included in this appeal. Regardless of the sufficiency of the description as applied to the land north of the railway track, we think it clear that it was the intention of the parties, as expressed in the mortgage, that the lien should apply to all crops raised by Burge on the land described in the deed from Broocks to Tyrrell, with the exception noted; and, as the Broocks deed conveyed practically all the land in that part of the Stivers league lying south of the railway track, the mortgage unquestionably applied to all crops raised thereon save the 150 acres to be grown by Burge which was excluded, and save the crops grown thereon by "other than the said Burge." We think it was sufficiently shown by "consistent extrinsic evidence that the property was within the intent of the parties as expressed on the face of the instrument." The view we take as to the disposition that should be made of the case obviates a more extended discussion of the question raised by the assignment.

[2, 3] Appellants' third assignment complains of the refusal of the court to instruct the jury to return a verdict in favor of defendants on their plea of limitation. They contend by their proposition under this assignment that, where plaintiff has delayed suit for conversion of mortgaged property more than two years after defendants' appropriation of it, the delay is not excused unless plaintiff proves the discovery of some new essential element of his cause of action within the statutory period before suit, and also proves circumstances which authorize the inference that reasonable diligence on the part of plaintiff would not have resulted in such discovery earlier than the statutory period before suit, and cite Calhoun v. Burton, 64 Tex. 511; Kuhlman v. Baker, 50 Tex. 637; Alston v. Richardson, 51 Tex. 6; Connoly v. Hammond, 58 Tex. 17; Vernor v. D. Sullivan, 126 S. W. 641—all of which support their contention.

The pleadings of plaintiff, in so far as material to this assignment, are, substantially, that Burge fraudulently obtained from them about $15,000 in advancements on the representation that he had 2,500 acres in rice subject to their mortgage, when he only had about 1,300 acres, and only about 800 acres if the crop in question be excluded; that the crop in question was in fact cultivated by Burge with seed and supplies furnished by plaintiff, and was included in their mortgage, but by a series of fraudulent instruments placing the apparent ownership in others the fact was concealed from plaintiff; that the proceeds of the crop in question were received by defendants, whom they allege to be parties to all said fraud by Burge; and further alleging that defendants, through their manager, had told plaintiff that defendants had not received said proceeds and had no knowledge of them; that although plaintiff, its manager and its federal court receiver, had made diligent efforts to ascertain what had become of said proceeds, they had been unable to do so until just prior to the filing of this suit. Plaintiff did not allege the date of the appropriation.

It appears from the evidence that plaintiff discovered some time in July, 1905, that Burge did not have a sufficient acreage in rice to justify it in supplying him further, and that they then so notified him and cut off his supplies. It also appears that the defendants were supplying Hamilton, at Burge's instance, on the crop planted by

Hamilton north of the track, and plaintiff knew this.

The testimony in the record abundantly shows that the 500-acre crop south of the railroad, in controversy, was farmed and owned by Burge, and that under the contract between Burge and the plaintiff all of it except 150 acres was subject to the latter's mortgage. Burge, however, with the fraudulent intent of deceiving plaintiff as to the ownership, placed the crop in the name of Cannon, one of his tenants, and, Cannon having died in the early part of the season, Burge then placed the crop in the name of one Naylor, and later in the season the crop was transferred by Naylor to one W. A. Hebert. All these transactions were simulated and fraudulent, and appellants so admit.

The record further justifies the conclusion, and we so find, that the appellants knew the 500 acres were farmed by Burge and knew that the various transfers of said crop above referred to were simulated and fictitious, and that the crop was subject to plaintiff's mortgage.

After plaintiff's refusal to further furnish Burge with supplies, the latter arranged with the Beaumont Rice Mills to furnish supplies to Naylor, and, when Naylor pretended to sell out to Hebert, continued to furnish Hebert until the amount aggregated several thousand dollars.

About harvest time the crop in question was publicly sold on competitive bids and bought in by the McFaddin-Wiess-Kyle Rice Milling Company. Notice of the sale was given, and the plaintiff knew of the time and place of sale, but had no representative at the sale nor did it submit a bid. It also knew that the McFaddin-Wiess-Kyle Rice Milling Company purchased the rice, and that the same was delivered to it. When the sale was made, the following written memorandum of sale was executed: "This instrument and contract, made and entered into by and between W. A. Hebert and McFaddin-Wiess-Kyle Rice Milling Company, both of Beaumont, Texas, witness: That for and in consideration of the sum of one ($1.00) to W. A. Hebert in hand paid, the receipt of which is hereby acknowledged, and for the further consideration of three (3.80) dollars and eighty cents, per barrel, f. o. b. cars Broocks Switch, Texas, said Hebert has this day sold to McFaddin-Wiess-Kyle Rice Milling Company, all rice now threshed on the south side of the Gulf & Interstate Railway located on what is know as the Tyrrell farm, together with all rice still unthreshed on the said farm on the south side of said railway, conditioned that same be threshed in a dry condition, it being understood that all rice be weighed and accepted at Broocks Switch, Texas, and drafts given in exchange for bills of lading at said place, all drafts to be drawn in favor of the Beaumont Rice Mills, of Beau-

mont, Texas, the said rice to be loaded on cars by the said W. A. Hebert as the cars are furnished by the Gulf & Interstate Railway. It is also understood between the parties hereto that all the said purchased rice is to be accepted by said McFaddin-Wiess-Kyle Rice Milling Company at the aforesaid price excepting wet and musty rice. Witness the hands of the parties hereto this 31st day of October, A. D. 1905. McFaddin-Wiess-Kyle Milling Co., by W. P. H. McFaddin."

Although plaintiff knew of the sale and of the fact that the rice was purchased by the McFaddin-Wiess-Kyle Rice Milling Company, it did not know of the written memorandum of sale, nor that the proceeds, by its terms, should be paid over to the Beaumont Rice Mills, but could have ascertained this fact by the exercise of ordinary diligence. The rice was not delivered to the purchaser on the day of sale, and some of it was not delivered until as late as December 9, 1905.

The trial judge in his charge to the jury fixed as the time of conversion of the rice the 31st day of October, 1905. Appellee has filed no cross-assignment of error attacking this charge. We hold, with the trial court, that the sale of the rice and the execution of the written memorandum of sale was a distinct appropriation of the rice to the satisfaction of the claims and liens other than plaintiff's and a repudiation of plaintiff's mortgages, and the conversion was complete on the day of sale, viz., October 31, 1905, and that upon that date the statute of limitations began to run against plaintiff, and that its claim was barred in two years unless the statute was postponed by reason of the excusable ignorance of plaintiff of its cause of action. But if plaintiff knew of its cause of action, or if it would have been known to a person ordinarily attentive to his business, or if plaintiff was in possession of facts which if pursued with reasonable diligence would have led to a disclosure to it of its cause of action, then the statute was not postponed. In other words, it having been indisputably shown that plaintiff knew of the sale of the crop of rice on October 31, 1905, if at that time it also knew that its mortgage liens applied to the crop, or if it knew facts which, if diligently pursued, would have led plaintiff to the discovery that the crop was subject to its mortgages, then the statute was not postponed, and plaintiff's cause of action was barred in two years thereafter. Upon careful inspection of the testimony, we have concluded that the evidence indisputably shows that plaintiff not only possessed information which if diligently pursued would have led to the discovery that the crop was farmed by Burge and therefore subject to its mortgage, but that it had actual knowledge of this fact. This brings us to a discussion of the evidence introduced upon this issue.

It will be remembered that plaintiff ceased furnishing money and supplies to Burge in July, 1905, when it ascertained that Burge did not have 2,500 acres in a rice crop. As before shown, plaintiff knew that the defendant Beaumont Rice Mills was furnishing supplies to Hamilton and Naylor at Burge's instance, and that plaintiff knew this, and it is inferable from the testimony that plaintiff knew that the Beaumont Rice Mills had taken a mortgage from Naylor to secure it for advances, for on September 12, 1905, the date said mortgage was filed for registration in the county clerk's office of Jefferson county, George M. Craig, general manager of plaintiff, wrote to the defendant Beaumont Rice Mills the following letter: "You are hereby notified that the Port Arthur Rice Milling Company claims and asserts a lien covering the rice crop raised on that portion of the S. Stivers league south of the Gulf & Interstate Railroad track, being the rice crop commonly known as belonging to Naylor, but being in fact the rice crop belonging to J. F. Burge, whose agent is R. T. Burge. We advise you of this fact so that if you make any loans or advances on that crop, you do so subject to our prior lien."

This letter, in addition to raising a reasonable inference that plaintiff knew the defendant Beaumont Rice Mills had taken or would take a mortgage on the crop in question, indisputably shows that at its date plaintiff was denying that the crop was Naylor's, but claiming that the same belonged to Burge and was subject to its mortgage. That this claim on the part of plaintiff was continued until as late as October 7, 1905, is shown by a letter written on said date by Messrs. Greer, Minor & Miller, attorneys for plaintiff, to W. A. Hebert, which reads as follows: "Having heard that you contemplate buying from F. D. Naylor the rice crop grown on the Stivers league south of the Gulf & Interstate Railroad track, we beg to notify you that the Port Arthur Rice Milling Company has filed a suit in the federal court against J. F. Burge, asserting in such suit that it has a lien, to secure in part an indebtedness of some twenty thousand dollars and more, on that rice crop, and that if you make any such purchase you do so at your own peril."

Here, upon dates wide apart, the plaintiff makes claim that the crop in question is subject to its mortgage.

Turning now to the actual knowledge of plaintiff as to the ownership of Burge to the crop in question, upon which the claim made in the two letters copied was evidently based, we find from the testimony of George M. Craig, plaintiff's vice president and general manager, that he not only had reason to believe, but did believe all along, that the crop in question was farmed by Burge and subject to plaintiff's mortgage. He testified: "The Port Arthur Rice Milling Company 141 S.W.—23

claimed at that time (September 13, 1905), the date the receiver of Burge's crops was appointed by the federal court, that the rice south of the track on the Stivers league was covered by their lien; we thought it was. We made that claim to our attorneys; I don't remember to who else we made that claim. I had no conversation with Mr. Naylor about that. I saw Mr. Naylor once in the attorney's office, in which we discussed the matter; but we were not making demand on him for it. We were trying to find out what interest, if any, Naylor had in there. He told us he was getting $100 a month salary. Our attorneys, I think, followed that inquiry up. I did not do anything further in that connection. I suppose I saw Mr. R. T. Burge during that time. We claimed from him this rice south of the track. He claimed that he was not planting it south of the track. He claimed that it was other parties'. He claimed that a man by the name of Cannon was farming some in there. He claimed that it belonged to Cannon. Later on he claimed that it was Naylor's. I don't remember the exact time he claimed to me that it belonged to Naylor. It was along in the summer some time. It was about the time, I think, of the filing of the federal suit. I saw him a time or two about it. I don't remember that I had any other conversation with him after the filing of the suit about who that rice belonged to south of the track. After the filing of the suit, the relations between Burge and I were not very friendly. We remained, so far as I know, unfriendly. I felt very badly about it. I thought he was trying to beat us out of that part of the land. I thought he was farming that part of the tract. I told him I thought so. He denied it. I told him I thought we could prove it, and that we were going to try to, and intimated to him that we might bring some personal action against him for that, if we did find the proof. He denied that it was him that was doing it. I told him that I had been informed that he was using our money and our seed and his mules on the south of the track, and he denied it, and I told him that reports kept coming to me to that effect, and he then told me that sometimes he did, but it was exchange work, but denied that he owned it and denied that it was subject to our mortgage. I did not make any further demand after that on Burge or on Naylor. I tried to get our attorneys to." He further testified: "I understood, according to the original mortgage, he (Burge) was to put in 150 acres (south of the track); but I say here that he put in, in truth and in fact, 500 acres." Again: " * * * He (Burge) claimed he was not putting in anything south of the track, and we thought he was, and the more we dug into it the more we thought he was." And again: "We thought the Burge was making advances to Naylor with our money; we had every rea-

son to believe that he was making both crops, north and south (of the railroad track), on our money, on our seed. He got too much seed for that land north of the track. We thought at that time, and all along down through there, that our seed was planting that crop. We were sure of our claim all the way through, but couldn't get him to admit it. We were afraid we couldn't prove it. He had the reputation of browbeating witnesses and things like that." He further testified: "I stated to Mr. Barry that I was claiming that our lien covered the land south of the railroad, and I wanted to go after Burge on that, and the reason we did not go after it was because our attorneys advised against it. It was this: Cannon, Naylor, and Hebert were there. We couldn't disprove their claims. We felt morally and legally and every other way certain that it did: * * * In swearing to this bill (bill in equity filed in the federal court) I excluded the land south and east of the G. & I. (railroad) through the advice of Greer & Minor. I insisted that it should go in, and they told me, unless we could overcome all the evidence which he (Burge) might bring to appear, that the garnishee would jump into that rice and throw us into a damage suit. We were sure it was our money and our seed. If Burge was not farming it, we were not then to have it under our mortgage. We did not decide that he was not farming it. * * * As I told you, Burge was very successful in litigation, he was in it all the time, and we were afraid he would produce any kind of evidence. * * * I did not take any action after the sale of the rice was made only through our attorneys. I wanted to do that very badly, but my attorneys said that if I thought I could beat Burge in a lawsuit, which I was afraid I couldn't do, because he was very resourceful in those matters."

F. C. Gaertner, who in 1905 was the credit agent of plaintiff, and whose duties consisted of going to the various rice farms and inspecting rice crops upon which plaintiff held liens "to see what they had" and "that they had it," and to report thereon to plaintiff, testified that he had made several visits to the land farmed by Burge; that after the rice came up he discovered that Burge had between 400 and 600 acres in rice south of the railroad; and that he reported this fact to the company. "My understanding right along was that Burge was owning that crop. * * * Burge told me the latter part of the season that he was farming that land south of the railroad."

We think the testimony above quoted sufficient to show that plaintiff knew from the time the crop came up until its sale on October 31, 1905, that the 500 acres of rice south of the railroad, less the 150 acres excluded from the mortgage, was farmed and owned by Burge and subject to its mortgage, and that plaintiff delayed the bringing of its

suit, not because of want of knowledge of its cause of action, but because it feared, on account of Burge's resourcefulness as a litigant, it could not prevail in a suit against him. It appears that the suit was not filed until about the time plaintiff received a letter from Burge indicating a willingness to furnish evidence in behalf of plaintiff against defendants in a suit for conversion of the rice in question, written from Roswell, N. M., where Burge was then living, in which he says: "I would like to know if the following documentary information would be of any assistance in a case against the Beaumont Rice Mills: Pay rolls of the party supposed to be the owner of the rice known as the Burge-Naylor-Hebert crop, some showing that Burge was really the owner and paid the labor? Itemized statements from the mill showing that said mill paid neither Naylor nor Hebert, but that they paid over $25,000.00 to some one? Letters over the signature of an officer of said mill showing that he was the director general of the whole 'cheese'? Affidavit from the supposed purchasers of some of this rice, that they only held the same in trust, having had an understanding that the mill was to receive the same or the proceeds if sold? An affidavit from all or some of the members showing P. A. R. M. Co.'s seed was used to sow the whole crop on the Tyrrell farm? If the above information would be of any assistance, kindly notify me, as I have reason to believe that it might be possible for these facts to exist, and if such is really the true state of affairs, I may be able to get them as above outlined."

Upon receipt of this letter this suit was at once filed. It contained no actual information upon the points suggested, but did clearly indicate that plaintiff no longer had Burge's resourcefulness as a litigant to combat, and that plaintiff could rely upon him as an ally and not dread him as a foe. We think that this turn in the situation of affairs, and not the suggestion of facts that could be proved, resulted in the immediate bringing of this suit. The letter added nothing in the way of information stronger than the testimony of plaintiff's agent, Gaertner, that it was his understanding all along that the 400 or 500 acres south of the railroad was owned by Burge, and that Burge told him in the latter part of the season he was farming the land south of the railroad, nor to the testimony of Craig, plaintiff's vice president and general manager, that he felt morally, legally, and in every other way certain that the crop was covered by plaintiff's lien, but that they did not proceed against him because he was a resourceful and successful litigant and he was afraid that Burge would defeat the suit.

But plaintiff contends that it did not know that the Beaumont Rice Mills had received the proceeds of the sale of the rice until it received the letter from Burge above copied,

and that it did not until then know of its cause of action against defendants for conversion, and that defendants by affirmative misrepresentations misled plaintiff and concealed from it the fact of the receipt of such proceeds by them. As before stated, plaintiff knew that the rice had been purchased by the McFaddin-Wiess-Kyle Rice Milling Company, and by the exercise of ordinary diligence might have ascertained that defendants received the proceeds. The claims of affirmative concealment are based upon a conversation between George M. Craig, plaintiff's general manager, and Joe Broussard, the manager of defendants. Craig testified that he met Broussard some time in the early fall of 1905, and they began to discuss Burge, and the former asked the latter how he came out with Burge and what fix he was in, and the latter replied "that he was in about the same box as we were"; that he did not then know that the Beaumont Rice Mills had received the proceeds of the sale of the rice, and the first he knew of it was when he received the letter from Burge above copied. Broussard, asked about this conversation, admitted that it might have occurred as testified by Craig, but added that he did not tell Craig anything about his connection with the rice. "He knew it; why should I?" He further said that he had become an indorser on Burge's paper, which he had to pay, and Burge had "cleaned him up" for $4,500.

We do not think that the testimony is sufficient to prove an affirmative or fraudulent concealment of any cause of action plaintiff may have had against defendant for conversion of the proceeds of the rice in question. Broussard was not asked about the receipt of the proceeds, and in answering Craig's question was not called upon to disclose to him the fact of their receipt. That he answered the question propounded to him truthfully is disclosed by the testimony which shows that both parties had been "cleaned up" for large sums by Burge. Besides this, it was shown that the plaintiff knew that the rice had been sold in open hostility to its mortgage, and it also knew who the purchaser was, and it seems to us that any sort of diligence by plaintiff would have resulted in a disclosure to it that the proceeds were paid to the defendant Beaumont Rice Mills.

We think that under the undisputed testimony plaintiff's cause of action accrued on the date of the sale of the rice; that plaintiff was not in ignorance of its cause of action at that time, and the statute of limitation was not, therefore, postponed; and that its claim against defendant for conversion was barred by the two years' statute at the time this suit was filed. For this reason the judgment of the district court will be reversed, and judgment here rendered for the appellants.

Reversed and rendered.